# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 26, 2012

No. 12-40914

Lyle W. Cayce
Clerk

VOTING FOR AMERICA, INC.; BRAD RICHEY; PENELOPE MCFADDEN; PROJECT VOTE, INC.,

Plaintiffs - Appellees

v.

HOPE ANDRADE,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
U.S. Dist. Ct. No. 3:12-CV-00044

Before SMITH, DENNIS, and HAYNES, Circuit Judges.

PER CURIAM:[*]

On September 6, 2012, we entered an order granting Appellant Texas Secretary of State Hope Andrade's[1] Emergency Motion to Stay the district court's Order (as modified) granting in part a preliminary injunction against the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Although Cheryl Johnson, Galveston County Assessor was also sued in the district court, she did not file a notice of appeal.

No. 12-40914

enforcement of certain Texas statutes and stating that reasons would be assigned later.   Those reasons follow.

## I.  Background of Election Code Chapter 13

Like other states, Texas has a system by which citizens desiring to vote in elections must register with the state.  *See generally* TEX. ELEC. CODE § 11.001 *et seq.*  "To encourage voter registration," Texas has instituted a system whereby volunteers can be appointed as "volunteer deputy registrars" (VDRs) empowered to accept voters' applications to be registered. TEX. ELEC. CODE § 13.031 *et seq.* (hereinafter the "VDR Law").  This basic structure has existed for over twenty years in Texas, with little incident and almost no reported cases.  However, in 2011, the Texas legislature amended the VDR Law to add certain requirements, including training of VDRs. TEX. ELEC. CODE § 13.047.

Appellant Hope Andrade is the Texas Secretary of State; in that capacity, she is charged with administering Texas's election laws.[2]  Appellees Voting for America, Inc., Project Vote, Inc., Brad Richey, and Penelope McFadden ("Appellees") state in their complaint that Richey and McFadden are individuals who have had difficulty both registering to vote in Texas and becoming VDRs; the two organizations have as their mission working to ensure that all eligible citizens register to vote.  In response to the 2011 amendments of the Texas Election Code, Appellees contend that they made inquiries of Andrade regarding the meaning of certain provisions in the VDR Law.  Unsatisfied with her response, they filed this lawsuit seeking a preliminary and permanent injunction against many of the provisions of the VDR Law, both old and new.  After briefing

---

[2]  At this point, Andrade has not reasserted the standing issues she raised in the district court.  Because standing is a component of federal subject-matter jurisdiction, we must examine it on our own. *Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 348 (5th Cir. 1989).  We conclude that the district court's analysis of standing is substantially correct, Appellees have standing to bring this case, and Andrade is at least *a* proper party to respond to it. *See Voting for Am., Inc. v. Andrade*, No. 3:12-CV-00044, 2012 WL 3155566, at *9–13 (S.D. Tex. Aug. 2, 2012).

## No. 12-40914

and an oral hearing at which testimonial and other evidence was presented, the district court entered an Order Granting in Part and Denying in Part Plaintiffs' Motion for a Preliminary Injunction. The court then modified this order twelve days later and denied Andrade's motion for a stay pending appeal. *See Voting for Am., Inc. v. Andrade*, No. 3:12-CV-00044, Order Den. Mot. for Stay (S. D. Tex. Aug. 14, 2012). Andrade appealed both orders to this court and, in the interim, sought a stay of the district court's order which, in turn, enjoins enforcement of certain portions of the VDR Law. We examine the order as modified as one unitary document.

Pertinent to this appeal, the district court enjoined enforcement of the following portions of the VDR Law:[3]

(1) that portion of Texas Election Code § 13.038 that prohibits VDRs from photocopying or other duplicating of voter registration applications submitted to the VDR but not yet forwarded to the county registrar (so long as no information deemed confidential under § 13.004 is included)(the "Photocopying Provision")[4];

(2) that portion of Texas Election Code § 13.042 that prohibits VDRs from sending in applications by United States mail (the "Personal Delivery Provision");

---

[3] For purposes of assessing this motion to stay, we examine only the preliminary injunction as modified on August 14, 2012. We note that Appellees challenge additional portions of the VDR Law, but we examine only those as to which enforcement was enjoined by the district court's order and as to which the current stay request pertains.

[4] Section 13.038 states: "A [VDR] may distribute voter registration application forms throughout the county and receive registration applications submitted to the deputy in person." Although this provision says nothing about photocopying, Appellees contend, and Andrade does not dispute, that Andrade has taken the position that VDRs are prohibited from photocopying forms they receive and, instead, are limited to transmitting such forms to the appropriate county official.

No. 12-40914

(3) that portion of Texas Election Code § 13.031(d)(3) to the extent it forbids non-Texas residents from serving as VDRs (the "Non-Resident Provision");

(4) that portion of Texas Election Code § 13.038 that prohibits VDRs appointed in one county from serving in another county (the "County Provision")[5]; and

(5) Texas Election Code § 13.008(a)(2) & (3) (the "Compensation Provision").

The task before this court is only to decide the emergency motion to stay, which we decided on an abbreviated briefing schedule and within a limited time (although we did hear oral argument, conducted on shortened notice). The question we address, then, is whether, while the appeal is pending, Texas can enforce the entirety of the VDR Law or whether it is proscribed from enforcing the sections outlined in the district court's injunction. We disclaim any intent to bind a subsequent merits panel.

It sometimes takes time to decide a question, but, meanwhile, time itself does not "stand still." *Nken v. Holder*, 556 U.S. 418, 421 (2009). "A stay does not make time stand still, but does hold a ruling in abeyance to allow an appellate court the time necessary to review it." *Id.* Before addressing the merits of the stay motion, we must first examine the applicable standards.

---

[5] Section 13.038, quoted in footnote 4, *supra*, does not have an express "county-by-county" limitation. Once again, however, the parties seemingly agree that Andrade construes the appointment of a VDR to be limited to the county in which the appointment is made. We note that this interpretation is supported by the language of Section 13.033 which contains the precise wording of the appointment document, including a statement that the county registrar "do[es] hereby appoint ___ as a [VDR] for _____ County," suggesting that the powers granted by appointment are limited to that county alone. TEX. ELEC. CODE § 13.033. This section has been the law for over twenty years, yet it has sparked no reported decision.

No. 12-40914

## II.  Standards For Granting a Stay

The standards for granting a stay pending appeal are well-established: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Nken*, 556 U.S. at 426. Such a stay is a matter of judicial discretion, not a matter of right.[6]  *Nken*, 556 U.S. at 433.  The factors to be considered in deciding whether to stay an order pending appeal are virtually the same as the factors used by a court in deciding whether to issue a preliminary injunction.[7]  Thus, we have here the somewhat circular situation of deciding whether there is irreparable harm to Andrade in part by analyzing the likelihood of success on the merits by Appellees of showing irreparable harm to them.[8]  This analysis plays out against a backdrop of impending November 6, 2012, elections for which the voter registration deadline in Texas is October 9, 2012.

---

[6]  The district court's denial of a stay of judgment pending appeal is generally reviewed for abuse of discretion.  *See Beverly v. United States*, 2d 732, 741 n.13 (5th Cir. 1972). This is an appellate standard of review, rather than an independent application of the factors relevant to a motion for a stay, as is presented here.  Nonetheless, "a district court necessarily abuses its discretion if its conclusion is based on an erroneous determination of the law." *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 425 (5th Cir. 2006).

[7]  In granting a temporary injunction, the district court must weigh four factors: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an inunction will not disserve the public interest." *See, e.g.*, *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

[8]  The dissenting opinion takes issue with this statement but, unquestionably, in the ultimate appellate review of the district court's decision, our court will have to examine whether Appellees met their burden to show irreparable harm in order to sustain the preliminary injunction. Whether Andrade is likely to succeed in showing that Appellees did not meet that burden is one question before us in the context of this emergency stay motion.

5

No. 12-40914

In this case, both sides cloak themselves in the mantle of irreparable harm – Andrade, because all the ills that gave rise to the need for the VDR Law can occur in connection with voter registration for the upcoming election, while Appellees counter that they will be prevented from fully implementing their large-scale voter registration drive efforts in connection with the same election. In one corner, Appellees valiantly champion the need to both encourage and facilitate citizens in registering to vote, a noble tradition in our country. In the other corner, Andrade agrees with this need, but is concerned about protecting the integrity of the registration process from harms of fraud or error, and from people who might seek to disenfranchise those with whom they disagree. Both sides claim the public interest supports them and that their prospective harm is greater than the harm to the other. While this panel rules only on the immediate motion to stay the district court's injunctive order pending appeal, the analysis under these circumstances centers on the likelihood of success on the merits. We turn to that question first.

## III. Discussion

### A. Standards Applicable to the Merits

The Supreme Court has expressly countenanced "substantial regulation of elections" to avoid "chaos," even as it has protected important rights, such as petitioning the government. *Buckley v. Am. Constitutional Law Found.,* 525 U.S. 182, 186 (1999)(internal citation and quotation marks omitted). Thus, a state has a substantial interest in protecting the sanctity of the voting process through regulation, even as it provides for the basic constitutional protections afforded to the political process.

Appellees made two basic challenges to the various sections of the VDR Law: violations of the First Amendment of the United States Constitution and violations of the National Voter Registration Act ("NVRA"), 42 U.S.C. §§ 1973gg *et seq.* Specifically, they contend that their right to engage in voter registration

activities is "expressive" in nature, such that limitations upon it abridge Appellees' First Amendment rights. Relevant to this motion to stay and the underlying appeal, the district court grounded its preliminary injunction against enforcement of the Non-Resident, County, and Compensation Provisions in First Amendment jurisprudence. It based the injunction against the Personal Delivery Provision and the Photocopying Provision upon the premise that they violate the NVRA. We examine each in turn.

Turning to the constitutional analysis, while not a model of clarity, it appears that Appellees make a facial challenge to the particular provisions, a very high hurdle.[9] *See, e.g.*, *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). They cite to no application or threatened enforcement of any provision relevant only to the Appellees, or causing substantial detriment particular to their specific interests.[10] Instead, they broadly challenge the relevant provisions as unconstitutional.

---

[9] At oral argument Appellees conceded that the challenge to the statute was facial, likely because there are insufficient factual allegations in the record to establish the Appellees' individual harm for an as-applied challenge. The dissenting opinion suggests that it does not matter whether the challenge is facial or "as-applied." It matters a great deal here because the district court – rather than attempting to construe statutes so as to make them lawful – accepted hypothetical scenarios Appellees posited to enjoin these laws. In an "as-applied" challenge, Appellees could point to some specific situation the district court, and this court in review, could examine. Very little in the way of hard facts – rather than rumor and vague "fears" was actually presented to the district court. Appellees' concession thus makes sense.

[10] Appellees' witness Michael Slater testified that he was not aware of any prosecutions of voter registration drive participants in Texas. Indeed, he testified that his organization conducted a successful large-scale voter registration drive in Harris County, Texas, in 2008 and that the impact of the amendments to the VDR law were "unknown." Testimony of Appellees' witness Estelle Holmes, a VDR in Galveston County, indicated that she was not aware of any instance where the laws have created concrete problems preventing third-party voter registration.

No. 12-40914

Our task as a federal court is, to the extent possible, to construe the provisions to avoid a constitutional conflict. *See, e.g., Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 514 (1990). A federal court should not lightly enjoin the enforcement of a state statute. *Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir. 1988). The determination of whether a democratically enacted statute is constitutional on its face requires that "every reasonable construction must be resorted to [ ] in order to save a statute from unconstitutionality." *National Federation of Independent Business v. Sebelius*, — U.S. —, 132 S.Ct. 2566, 2594 (2012). In this vein, Andrade's interpretation must be accorded some meaningful weight, as she is the official charged with enforcing the statute. *See Bellotti v. Baird*, 428 U.S. 132, 143 (1976). We defer to her interpretation of how the law is to be enforced, so long as it does not conflict with the statutory text. *See Hamer v. Musselwhite*, 376 F.2d 479, 481 (5th Cir. 1967) (deferring to the city's interpretation of an ordinance because city officials are charged with enforcing the statute and are the ones who must apply it).

Most constitutional analyses of a statute begin with an examination of the degree of scrutiny a statute will receive. *Cf. District of Columbia v. Heller*, 554 U.S. 570, 634 (2008) (describing three "traditionally expressed levels" of scrutiny: "strict scrutiny, intermediate scrutiny, [and] rational basis"). Strict scrutiny, the most severe test, is applied to "core political speech," described as "interactive communication concerning political change." *Meyer v. Grant*, 486 U.S. 414, 422 (1988). Importantly, simply labeling a challenge as one under constitutional guarantee such as free speech does not make strict scrutiny applicable. *See, e.g., United States v. Marzzarella*, 614 F.3d 85, 96-97 (3d Cir. 2010) ("[T]he right to free speech, an undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue." (internal citations omitted)). The

district court appeared to apply "intermediate scrutiny,"[11] reasoning that all aspects of the voter registration process are "expressive" in nature, thus implicating First Amendment rights and requiring (at least) intermediate scrutiny under *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). *See Andrade*, 2012 WL 3155566, at *19–23. Under this test, state election codes regulating voter registration may burden an individual's right to vote and to political association, but only to the extent justified by the State's legitimate goals. *Anderson*, 460 U.S. at 788; *see also R.A.V. v. St. Paul*, 505 U.S. 377, 429 (1992) ("[T]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." (quoting *Texas v. Johnson*, 491 U.S. 397, 406 (1989)). Alternatively, if the conduct is found to be non-expressive and therefore unprotected, the statute will be scrutinized for its "rational basis." *See Heller*, 554 U.S. at 628 n. 27 (if the law does not implicate a specific constitutional rights, such as freedom of speech, then rational basis review applies).

In examining the claimed violations of the NVRA, we must analyze whether the challenged provisions of the VDR Law conflict with the federal statute such that the NVRA preempts the contrary state provision. Though states generally bear responsibility for the mechanics of congressional elections, Congress may act to preempt state legislative choices. *See Foster v. Love*, 522 U.S. 67, 69 (1997). Much like traditional Supremacy Clause preemption, conflicts with federal election regulations render state law inoperative. *See Ex parte Siebold*, 100 U.S. 371, 384 (1879). To this end, state laws cannot "directly

---

[11] We have defined "intermediate scrutiny" in the First Amendment arena as follows: "[W]e . . . sustain the provisions [under intermediate scrutiny] if they further an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 641 (5th Cir. 2012) (internal citation and quotation marks omitted).

No. 12-40914

conflict" with federal election laws on the subject. *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000).  However, when confronted with two possible interpretations of state law, the court has "a duty to accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005).

### B.  Likelihood of Success on the Merits

### 1.  County and Non-Resident Provisions

We conclude that Andrade has presented a strong likelihood of success on the merits in that the district court incorrectly applied these standards in the order it issued.   We turn first to the County Provision and the Non-Resident Provision, both of which, as pertinent here, apply only to the question of who may be appointed as a VDR and empowered to physically receive a completed voter registration application from a potential voter and transmit it to the proper county official.

The First Amendment protects political expression manifested through conduct, as well as speech. *See Johnson*, 491 U.S. at 406 (holding that the burning of an American flag is conduct "sufficiently imbued with elements of communication to implicate the First Amendment" (internal citation and quotation marks omitted)).  To determine whether particular conduct possesses sufficient "communicative elements" to fall under the First Amendment, courts look to whether there was "[a]n intent to convey a particularized message" and whether "the likelihood was great that the message would be understood by those who viewed it." *Id.* at 404 (internal citations omitted).

All parties agree that the primary act of simply encouraging citizens to vote constitutes core speech and would be protected under the First Amendment. State restrictions on this activity would be analyzed under the lens of strict scrutiny, under which the state would have to advance a compelling justification for its regulation.   Concomitantly, we have recognized that states have a

compelling interest in protecting citizen's rights to vote. *Schirmer v. Edwards*, 2 F.3d 117, 121 (5th Cir. 1993)(upholding limits on electioneering within a certain distance from a polling place). No one contends that Appellees have been prevented from actually speaking to anyone about voting; at best, they have made an argument that their "expressive conduct" is being restricted. Importantly here, Andrade has repeatedly asserted that she does not and will not seek to enforce the VDR Law to prevent any individual or organization from freely handing out voter registration applications and encouraging citizens to vote. The district court accepted these representations for purposes of its analysis, so we do as well. Thus, the focus of the VDR Law as enjoined by the district court is not on whether a party may encourage another to register to vote, but whether a private party can actually receive the prospective voter's completed registration application and handle it in some way. In essence, they contend a First Amendment right not just to speak out or engage in "expressive conduct" but also to succeed in their ultimate goal regardless of any other considerations.[12]

---

[12] Here, that ultimate goal is a laudatory one of having citizens vote. But First Amendment protections exist not just for speech that may be noble but also for speech that is not. The Court's discussion in *Meyer*, 486 U.S. at 421, of the rights of parties to "select what they believe to be the most effective means" to advocate a cause cannot be seen as embracing an "anything goes" philosophy for any conduct that may relate in any way to speech or expression. Moreover, the argument that Appellees' expressive activity, here the promotion of voter registration, is contingent on the "success" factor of *actually registering voters* is a novel interpretation of First Amendment doctrine. While the First Amendment protects the right to have and express political views, nowhere does it protect the right to ensure those views come to fruition. In this context of voter registration, a goal all parties here support, expansive protection would appear harmless. However, applied in other contexts, where the underlying speech is less universally accepted, the effects of such a rule prove otherwise. Imagine for example, the opposite situation, where an organization's goals are to *discourage* voting and voter registration. Again, the First Amendment protects the expression of such views. But freedom of expression cannot be used to protect that group's "right" to successfully achieve its expressive goals of preventing others from voting by throwing the registration cards away.

Appellees also rely on *Meyer* (and the later Supreme Court case of *Buckley*) to urge that the VDR Law has "the inevitable effect of reducing the total quantum of speech," limiting "the

No. 12-40914

Appellees contend, and the district court accepted, that *all* aspects of a voter registration drive are "expressive conduct" protected by the First Amendment.[13] We perceive a significant distinction between voter registration activity that urges citizens to vote (constituting protected expressive conduct, allowed without regulation by the VDR Law as considered by the district court), and the activity of collecting completed applications and submitting them to the government on behalf of voters (non-expressive conduct, permissibly regulated by the VDR provisions). Because different legal principles apply to these two discrete actions, it is important to assess regulations on each separately. *See Planned Parenthood v. Suehs*, – F.3d –, 2012 WL 3573642, at *4 (5th Cir. 2012) (reviewing a temporary injunction that impermissibly grouped state regulations on promotion of abortion with the right to affiliate with other pro-choice supporters).

---

number of voices who will convey [Plaintiffs'] message and the hours they can speak and, therefore, limit[ing] the size of the audience they can reach." 486 U.S. at 422. This argument simply does not apply. No party argues that the law prevents anyone, regardless of domicile or VDR appointment, from passing out registration forms and encouraging others to vote. The size of the audience remains the same, and the "total quantum of speech" is unaffected. While affirming the striking down of some provisions of Colorado law in *Buckley*, the Court recognized an "important interest" of the state in protecting the integrity of the ballot initiative process there at issue and in deterring fraud. 525 U.S. at 204-05. *Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010), discussed by the dissenting opinion here, addressed a ban on political speech based upon the identity of the speaker as a corporation; that issue is not before us.

[13] At oral argument, Appellees urged the court to draw a close parallel to the Supreme Court's reasoning in *Meyer,* 486 U.S. at 422, finding that the circulation of initiative petitions was a matter involving the core political speech rights of the circulators under the First Amendment. The analogy is improper. The circulation and submission of an initiative petition is closely intertwined with the underlying political ideas put forth by the petition. The *petition itself* is the protected speech. Moreover, the very nature of a petition process requires association between the third-party circulator and the individuals agreeing to sign. In the voter registration context, the underlying expressive conduct (encouraging democratic participation and voting) does not implicate a third-party's right to process the application. Voter registration applications are individual, not associational, and may be successfully submitted without the aid of another. Here, the actual expression is not being limited.

12

No. 12-40914

We conclude there is nothing "inherently expressive" about receiving a person's completed application and being charged with getting that application to the proper place.[14]  *See Rumsfeld v. Forum for Academic & Instituitonal Rights, Inc.*, 547 U.S. 47, 66 (2006) ("[W]e have extended First Amendment protection only to conduct that is inherently expressive.").  No circuit court has held that the actual receipt and delivery process is, itself, entitled to First Amendment protection.[15]  District courts that have held as the district court did here fail to apply the discerning regulation-by-regulation analysis we most recently employed in *Suehs.  See League of Women Voters v. Cobb*, 447 F. Supp. 2d 1314, 1322 (S.D. Fla. 2006) (finding certain requirements imposed on third-parties who collect registration forms unconstitutional as "reducing the quantum of political speech"[16]); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 699 (N.D.

---

[14]  Appellees do not contend that they should be free to receive a completed application from a prospective voter and throw it in the trash.  Implicitly, if not explicitly, they concede the importance of making sure this process is handled carefully and without fraud or malfeasance.

[15]  The Eleventh Circuit affirmed a district court's preliminary injunction enjoining a Georgia voter registration statute, which rejected voter registration forms submitted to the state in a single mailed package. *Charles H. Wesley Educ. Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005) (finding the "associational and franchise-related rights asserted . . . were threatened with significant, irreparable harm . . . without question in the public interest.") However, this case is easily distinguishable because in applying its "anti-bundling" provision, Georgia refused to accept the wrongfully submitted applications, thus impermissibly depriving the applying voters of franchise.  The Texas code only operates to penalize VDRs who do not submit applications according to statute, while still accepting a voter's timely applicaiton in compliance with the NVRA.  Moreover, although the petitioners in *Cox* alleged First Amendment violations, neither the district court nor the 11th Circuit addressed any constitutional rights concerning the receipt and submission of voter registration applications.

[16]  One key difference between the Florida statute at issue in *Cobb* and the Texas VDR Law is that the Florida statute discriminated against non-political party organizations. *Cobb*, 447 F. Supp. 2d at 1335.  An appeal of the district court's decision was dismissed as moot after Florida substantially amended its statute.  *League of Women Voters of Fla. v. Browning*, 2008 U.S. Dist. LEXIS 108147, at *5 n.3 (S.D. Fla. 2008).  Thereafter, that district court declined to enjoin enforcement of the amended law.  *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1325 (S.D. Fla. 2008).  Several years later, a different district court in Florida preliminarily enjoined enforcement of a still further amended statute that contained

No. 12-40914

Ohio 2006) (applying intermediate scrutiny to all aspects of third-party registration laws); *see also American Association of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1200 (D.N.M. 2010) (finding that the plaintiff's generalized third party voter registration activity implicated expressive conduct because it was intended to "convey a message that voting is important"). The courts broadly considered voter registration activities as protected activity generally, instead of drawing distinctions between the type of conduct and type of regulation at issue. Thus, we find their analyses unpersuasive.

Because we conclude that the physical receipt and delivery of completed voter registration applications are not "expressive conduct" as separately analyzed and are not "part and parcel" of the expressive conduct, we employ rational basis scrutiny to the County and Non-Resident Provisions. With respect to the Non-Resident Provision and the County Provision, Andrade justifies these requirements on the theory that local control over people entrusted with these applications is an important and necessary safeguard in preventing fraud and improper handling of such applications. While we cast no aspersions on the parties before us, we recognize that without some regulation, out-of-state individuals could descend upon Texas before the voter registration deadline, engage in unlawful and fraudulent registration practices, and then leave the state before action could be taken against them. Importantly, Appellees' own witness (Executive Director of Project Vote, Michael Slater) eschewed any desire to have the voter registration drives run entirely by those from out-of-state,

---

a "48-hour" requirement for turning in applications and which the court construed as a prohibition of use of the mails. *League of Women Voters of Fla. v. Browning*, – F. Supp. 2d –, No. 11-628, 2012 WL 1957793 (N.D. Fla. May 31, 2012). Importantly, there, the state claimed no interest in prohibiting third-party registrants from using the mails. *Id.* at *6. Thus, the arguments presented here were not addressed.

dismissing the practice of "parachuting in" by out of state individuals.[17]   He emphasized that registration drives are much more effective when conducted by locally-recruited personnel.  Requiring that VDRs be residents of Texas enables law enforcement officials to more readily find and hold accountable those who engage in unlawful practices.  As such, Andrade has demonstrated a rational basis for these laws.

Appellees suggest (and the district court and dissenting opinion appear to accept) that these provisions will prevent non-resident volunteers from participating in voter registration drives.  Nothing in the statute or record indicates that non-resident volunteers will be prohibited from participating in voter registration activities in a non-VDR capacity.  Indeed, Andrade has made it clear that the act of passing out voter registration applications or otherwise encouraging voter participation may be performed by any individual.  National "get out the vote" campaigns can still operate in Texas largely unchanged, provided there are properly appointed resident VDRs involved to facilitate any activities that only VDRs are empowered to do (namely the receipt and transmission of the completed application).[18]   No evidence was presented that "get-out-the-vote" efforts actually have been unable to operate prior to or after the amendments to the VDR Law.  Indeed, Appellees' witness was unaware of the effects of the VDR Law on other groups' voter registration efforts in Texas, only vaguely stating that they have not told him they are conducting drives.  We conclude that Andrade has made a strong showing of the likelihood of succeeding

---

[17]   Mr. Slater was asked, "What is your opinion about parachuting in, is that an effective way to do things?"  He answered: "No, it's not an effective way to do that."

[18]  When given the chance to actually submit facts to support his concerns about Texas, Slater had little to offer beyond the bare conclusion that it is "too difficult" to conduct voter registration drives in Texas.

No. 12-40914

on appeal in showing that the County and Non-Resident Provisions meet this threshold.

2. Compensation Provisions

With respect to the Compensation Provisions, we agree that these provisions encompass some expressive conduct rather than merely the receipt and delivery of completed voter registration applications. *Cf. Meyer*, 486 U.S. at 428 (striking down a Colorado law prohibiting payment of petition circulators). Thus, we assume without deciding that intermediate scrutiny applies to the compensation provisions. Andrade explains that these provisions are designed to avoid placing paid "volunteers" in the position of having to meet particular number or quota requirements in their registration efforts. The incentives for fraud in a quota system are obvious, as Appellees implicitly concede, and Appellees do not even wish to pay their "volunteers" on a quota or numerical basis.[19] Instead, they speculate that they will be unable to hire and fire people who fail to perform properly because they may run afoul of the Compensation Provisions.[20] We conclude that rather than construing these provisions to find them constitutional, particularly important in a facial challenge case, the district court accepted Appellees' proffer of speculative and imagined circumstances that might make the provisions unconstitutional as applied to a hypothetical situation. *Project Vote v. Kelly*, 805 F. Supp. 2d 152 (W.D. Pa. 2011) (declining to strike down laws regulating compensation of voter registration "volunteers"); *cf. Preminger v. Peake*, 552 F.3d 757, 766 (9th Cir. 2008) (holding that Veterans Affairs office's proffered reason of protecting patient trust as a basis denying

---

[19] Slater admitted that paying "volunteers" for each registration encourages fraud.

[20] Appellees presented expert testimony to the effect that low paid "unskilled workers," such as those they would hire to engage in voter registration outreach, need goals in order to be motivated to work. The expert witness admitted having no actual knowledge of voter registration work or employees who work in that field.

partisan voter registration activities in its facilities was a "reasonable rationale").

As discussed above, Appellees did not expressly explain whether this challenge is facial or "as-applied" in their brief. If facial, as conceded at oral argument, Andrade has made a strong showing that the challenge will fail because these sections can apply constitutionally to proscribe quota or numerically-based compensation situations that all agree are a recipe for fraud. The State has a legitimate interest in preventing fraud. *Buckley*, 525 U.S. at 204-05. This provision was enacted in part to rectify problems with the previous law that enabled an incentive for fake voter registration applications such as those made through the Project Vote scandal, where employees were paid $1.00 for each voter registration application received. Staff of the House Comm. on Oversight & Gov't Reform, 111th Cong. (Feb. 18, 2010); *see also* Comm. Rep. HB 239, 82d Leg. (Tex. 2011) ("In many of the scandals, the convicted individuals specifically cited compensation or performance quotas as the incentive to fraudulently complete voter registration forms."). The district court discounted this rationale because Texas's provisions are stricter than other states, and found there was no indication that Texas voter registration efforts are more susceptible to fraud. *Andrade,* 2012 WL 3155566, at *6-7, 32. However, Texas has a legitimate interest in protecting against voter fraud.

Even if this challenge were an "as-applied" challenge, Andrade has made a strong showing that it is likely to fail because Appellees have not shown that they actually have been prevented or hindered by this statute from hiring "volunteers" and firing them if they fail to perform properly. Unlike the cases cited by the district court, *see, e.g.*, *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 377 (6th Cir. 2008),[21] the VDR Law does not require third-party

---

[21] The Ohio code at issue in *Citizens for Tax Reform* stated "No person shall pay any other person for collecting signatures on election-related petitions or for registering voters

organizations to pay only by hourly wage or limit their ability to discharge or reward employees, it merely limits Appellees from using a quota-based metric in isolation to evaluate performance. The hypothetical circumstance where Appellees fire an employee who simply sat at a table and did nothing to engage passers-by or encourage them to vote and then are charged with violating the Compensation Provisions is just that, hypothetical. As such, an "as applied" challenge rests on a faulty premise.[22]

3. Photocopying and Personal Delivery Provisions

Turning to the alleged NVRA violations, we agree with Appellees that federal law preempts state law in this area *to the extent of a conflict*. We conclude, however, that Andrade has made a strong showing that she is likely to prevail in showing that the Photocopying and Personal Delivery Provisions do not conflict with the NVRA. The NVRA mandates that "[e]ach State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 42 U.S.C. 1973gg-(6)(i). Texas law as interpreted by the Secretary of State prevents third-party facilitators from photocopying applications before they are processed by the State. Appellees contend that they are copying a "public record" when they photocopy completed voter registration applications in their possession and that, therefore, the Photocopying Provision violates the NVRA. Texas Election Code

---

except on the basis of time worked." 518 F.3d at 377.

[22] The district court made no specific findings of fact with respect to particular harm to Appellees, stating only: "Plaintiffs presented a significant amount of testimonial and documentary evidence detailing how the challenged provisions of the Election Code prevent them from conducting effective voter registration activities in Texas." *Andrade,* 2012 WL 3155566, at *33. We cannot give deference to such conclusory findings of fact, particularly in light of the actual evidence presented to the trial court which provided little in the way of detail or facts underlying the broad conclusions reached.

No. 12-40914

§ 13.038 states that a VDR "may distribute voter registration application forms throughout the county and receive registration applications submitted to the deputy in person."  Though this provision does not explicitly prohibit photocopying, Andrade interprets this provision to limit VDRs to collecting and properly delivering applications, thereby impliedly precluding photocopying.[23]

While nothing in the Texas Election Code precludes public inspection of properly submitted voter registration applications, including those submitted by VDRs, Texas law, as construed by Andrade, prevents *pre*-submission photocopying.  The NVRA pertains to state-maintained registration records, requiring states to make records available for public inspection and photocopying for two years after submission and processing. The VDR is "deputized" only to receive and transmit completed applications, not to "maintain" them for the state.  TEX. ELEC. CODE § 13.038.  The state and federal provisions do not conflict.

*Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) is not to the contrary.  That case specifically addressed records in the government's possession, rather than in the hands of VDRs.  Indeed, the NVRA only applies to records "maintain[ed]" by the State.  The district court's allusion to the State's constructive possession through VDRs is not based upon any statute, state or federal, and the statute does not permit VDRs to "maintain" the

---

[23] Whatever the salutary purpose of the photocopying (as discussed in the dissenting opinion), the question is whether the Photocopying Provision conflicts with the NVRA, not whether it is a good idea.  We note, however, that Slater testified that the photocopies are kept "forever" on a database, and he does not know how secure the database is.  Appellees state that they redact sensitive information such as drivers' license or social security numbers if required to do so by state law before copying.  While we do not question their sincerity, we note that it is not unreasonable for the State to require parties to obtain public government records from the government, which can then make sure that appropriate redactions occur before the records are released.

No. 12-40914

applications.[24]  *Andrade,* 2012 WL 3155566, at \*17.  The entire purpose of § 1973gg-(6)(i) is to facilitate public inspection of public records, and possession by a county-appointed VDR, perhaps one of hundreds in a given county, does not equate to a public record.  Moreover, precluding photocopying until the applications have changed hands is not mere "administrative chicanery," but protects voter privacy.  The Fourth Circuit highlighted that fact, noting that social security numbers may be redacted from applications processed by the State before being "ma[d]e available" to the public.  *Project Vote*, 682 F.3d at 339.  This additional privacy protection is unavailable where the State has not yet received the applications. We agree with Andrade that, until these applications are actually received by a government official, they are not "public records maintained" by the State.  Accordingly, there is no conflict between the NVRA and the Photocopying Provision.

The NVRA also requires that applicants be able to use the United States mail to forward their registration to the appropriate officials.  The Personal Delivery Provision of the Texas statute is not to the contrary, as it does not address whether the prospective voter can mail an application or not, instead limiting a third-party (the VDR) who has agreed to deliver the application for the voter from doing so.  Texas law requires an appointed VDR accepting voter registration applications to deliver the forms in person to the county registrar.  *See* TEX. ELEC. CODE § 13.042.

Again, the two laws do not conflict.[25]  The NVRA simply does not address the use of mails by third-parties to submit applications.  Section 1973gg-4

---

[24]  To the contrary, they must deliver them to the county registrar within five days. TEX. ELEC. CODE 13.042(b).

[25]  Rather than trying to construe the state and federal laws in harmony, the dissenting opinion finds a conflict in that VDRs cannot use the mails.  However, the NVRA does not address whether third-parties to the registration process must be permitted to use the mails. Thus, there is no actual conflict.

20

requires states to "accept and use" a federal mail-in voter-registration application. Texas law requires in-person delivery of forms by VDRs to promote accountability and foreclose the excuse of "lost" applications in the mail. Texas is understandably concerned with partisan third-party VDRs potentially motivated to discard applications thought to be adverse to their political leanings.

Importantly, Texas law requires county registrars to accept every voter-registration form that arrives through the mails. *See* TEX. ELEC. CODE §§ 13.071–.072. This includes applications sent through the mails by VDRs in violation of state law. Texas, therefore, "accepts and use[s]" every federal mail application, while penalizing VDRs for using the mail to submit other people's applications. As a result, individuals in Texas may, in every circumstance, send their applications through the mail. This promotes voter turnout and ease of registration. Texas's VDR provisions accomplish a similar goal, albeit based in a third-party regime. This law does not conflict with the NVRA's provision for mail-in applications because individuals may mail their applications in; VDRs may not.

This element of the VDR Law distinguishes it from the law considered by the Eleventh Circuit in *Cox,* 408 F.3d at 1354-55. The state argued there that the NVRA only requires mailed registration be accepted where the mailing met additional state requirements and that the state may regulate the method of delivery. *Id.* The court rebutted this assertion, however, stating that the NVRA "simply requires that valid registration forms delivered by mail and postmarked in time be processed." *Id.* at 1354. Unlike the law analyzed there, Texas law would have undisputedly required acceptance of forms sent in contravention of state law. In this way, Texas has established anti-fraud provisions by penalizing nonconforming VDR conduct, yet explicitly set out to comply with the NVRA by

No. 12-40914

accepting applications despite any noncompliance with state law. Again, no conflict.

We thus conclude that Andrade has made a strong showing of likelihood of success on this appeal. Where a lawful statute is enjoined, the state suffers irreparable harm by its injunction and the public interest lies in the enforcement of state laws. *See Maryland v. King*, 2012 U.S. LEXIS 5018, at *3 (2012) (Roberts, as Circuit Justice, in chambers); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, as Circuit Justice, in chambers); *Coalition for Economic Equality v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997). While each side can claim harm regardless of how we rule,[26] we conclude that the balance of harms favors Andrade in light of the great likelihood of success on the merits. Accordingly, she is entitled to a stay pending appeal.

Although we have, of necessity, addressed the merits of this appeal in our analysis, we again caution that our ruling does not bind the subsequent merits panel addressing this appeal, and we disclaim any intent to do so. *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 704 (5th Cir. 1997).

---

[26] The dissenting opinion focuses on harm to Appellees' "business model" from the Texas restriction. For example, Appellees want to copy applications so they can "follow up" with potential voters. However, they put on no evidence in the district court that they are prevented from obtaining information from potential voters by simply asking them for follow-up contact information such that they can contact the potential voter by the means most efficacious for that voter (mail, e-mail, telephone, or some other means). The dissenting opinion also catalogs perceived harms caused by various provisions of the law not at issue here. For example, the dissenting opinion describes the five-day delivery period requirement of §13.042(b) as burdensome, although this provision was not enjoined beyond the "personal delivery" portion. Additionally, this provision has been in place for over twenty years, yet Slater admitted that his organization conducted a "successful" voter registration drive in Harris County, Texas in 2008, registering 23,000 voters, apparently finding it possible to comply with this law.

No. 12-40914

Accordingly, as we ruled by order of September 6, 2012, the Emergency Motion for Stay is GRANTED, and the district court's injunction orders are STAYED until the final disposition of this appeal.

No. 12-40914

DENNIS, Circuit Judge, dissenting.

I respectfully dissent from the majority's stay of the judgment of the United States District Court for the Southern District of Texas enjoining the Texas Secretary of State from applying five provisions of the state election code against the plaintiff nonprofit voter registration and voting organizations. Because the majority completely disregards and fails to apply the Supreme Court's standards governing a court of appeals' issuance of a stay of a lower court's judgment, it erroneously grants the Secretary's motion to stay the district court's judgment pending her appeal.

The plaintiffs in this action are nonprofit voter registration and voting organizations that seek to assist African-American and Latino citizens in Texas in registering to vote and voting in the upcoming federal elections. The complaint alleged that the Secretary's enforcement of Texas Election Code provisions will prevent them from engaging in their chosen, effective methods and practices for assisting and encouraging citizens to register and to vote. After a full hearing, the district court issued a preliminary injunction enjoining the enforcement of five provisions of the state election code, *viz.*, the requirements that persons providing such assistance must be residents of Texas and appointed in the particular county in which each assisted citizen resides; that assisters personally deliver to registrars all completed voter registration applications obtained within five days; that assisters must refrain from copying or retaining copies of the completed applications; and that assisters may not be compensated in any way tied to the number of completed applications they

No. 12-40914

submit. The district court held that the residency, in-county, and compensation provisions were unconstitutional on First Amendment grounds; and held that the bans on photocopying and mail-in submissions were preempted by the National Voter Registration Act (NVRA). The district court refused to stay its injunction, and the Secretary appealed and sought a stay from this motions panel.

## I. Standards Governing the Issuance of Stays

The standards governing the issuance of stays are well established. As the Supreme Court explained in *Nken v. Holder*, 556 U.S. 418 (2009), "[a] stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case. The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion. The fact that the issuance of a stay is left to the court's discretion does not mean that no legal standard governs that discretion. A motion to a court's discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *Id.* at 433-34 (internal quotation marks, alterations, and citations omitted).

"[T]hose legal principles have been distilled into consideration of four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). As to the chance of success on the merits, "more than a mere possibility of relief is

25

required.  By the same token, simply showing some possibility of irreparable injury fails to satisfy the second factor. . . . [T]he 'possibility' standard is too lenient."  *Id.* at 434-35 (internal alterations, quotation marks, and citations omitted).

"[A] reviewing court may not resolve a conflict between considered review and effective relief by reflexively holding a final order in abeyance pending review.  A stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant[.]'" *Id.* at 426-27 (emphasis added) (internal citations omitted).  A stay pending appeal is an "extraordinary remedy." *Belcher v. Birmingham Trust Nat'l Bank*, 395 F.2d 685, 685 (5th Cir. 1968).  It is well established that it is the stay applicant's burden to demonstrate that the four factors for obtaining a stay pending appeal are satisfied. *E.g.*, *Nken*, 556 U.S. at 433-34.

In the procedural posture of this case, we are considering whether the defendants are likely to be able to show that the district court abused its discretion in granting a preliminary injunction. *See U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 380 (6th Cir. 2008).  "A district court's determination as to each of the elements required for a preliminary injunction are mixed questions of fact and law, the facts of which this Court leaves undisturbed unless clearly erroneous." *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009).  Questions of law are reviewed *de novo*, but "the ultimate decision for or against issuing a preliminary injunction is reviewed under an abuse of discretion standard." *Id.* (quotation marks omitted).

Moreover, under this Court's precedent, the district court's denial of a stay pending appeal is reviewed for abuse of discretion: "[T]he accepted standard for review of such a stay is whether or not the trial court abused its sound discretion

in denying the stay." *Beverly v. United States*, 468 F.2d 732, 740 n.13 (5th Cir. 1972); *see also, e.g.*, *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23 (5th Cir. 1992) (same); *Allen v. La. State Bd. of Dentistry*, 948 F.2d 946, 949 (5th Cir. 1991) (applying abuse of discretion standard to district court's stay ruling).

Whether or not the plaintiffs prevail in this court, the fact is that they were granted partial constitutional relief by the district court. The burden is on the Secretary to establish that the judgment of the district court should not be enforced. In my judgment, as in the judgment of the district court, the Secretary has failed to carry her burden to make a strong showing that: (1) the state will be irreparably injured if a stay is not granted pending her appeal; (2) on the other hand, there is *not* a substantial likelihood that the First Amendment speech and voting rights of the plaintiff voter organizations and of the citizens they seek to assist will be irreparably injured by the stay; (3) there is a strong likelihood that the Secretary will succeed on the merits in her appeal; and (4) the public interest will be served by the stay.

## II.     No Irreparable Injury Shown By Applicant

The Secretary has not carried her burden of demonstrating that she will be irreparably injured absent a stay of the district court's judgment during her appeal. *See Nken*, 556 U.S. at 433-34; *Hilton*, 481 U.S. at 777. "[S]imply showing some 'possibility of irreparable injury' fails to satisfy the second factor." *Nken*, 556 U.S. at 434-35 (citations omitted). The Secretary introduced no evidence to show that she or the state would be injured by the injunction of the enforcement of the five election code provisions during her appeal. The majority does not find from the record that the applicant will be irreparably injured, either; it merely presumes that a state is irreparably injured whenever any of

No. 12-40914

its laws is enjoined, citing statements to this effect by two members of the Supreme Court in individual chambers opinions. *See* Maj. Op., *ante* at 19-20. Those statements have not been embraced by the whole Court, however, and were made as part of a much different  standard to be applied only  during a Circuit Justice's individual determination of whether to issue a stay pending the Court's consideration of a petition for certiorari.[1]  They were not intended as precedents to be followed by the courts of appeals in deciding whether to stay judgments of district courts.  Instead, those members of the Court, both chief justices, joined the Court's majorities in prescribing the standards stated above that we must adhere to in deciding whether to stay a district court judgment pending appeal in *Nken v. Holder*, 556 U.S 418 (2009) and *Hilton v. Braunskill*, 481 U.S. 770 (1987).

Here, the state has not demonstrated any concrete way in which it would be irreparably injured by the denial of a stay of the district court's judgment during its appeal.  The five provisions at issue here are the in-state requirement, the in-county requirement, the personal delivery requirement,  and the photocopying prohibition, and the compensation prohibition.  The Secretary

---

[1] Citing *Maryland v. King*, No. 12A48, 2012 WL 3064878, at *2 (Roberts, Circuit Justice 2012); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (Rehnquist, Circuit Justice 1977)).  In those cases, the standard the Court applied for obtaining a stay pending disposition of a petition for a writ of certiorari was entirely different that involved in an application for a stay pending appeal, imposing a much lower burden on the applicant. *See King*, 2012 WL 3064878 at *1. Moreover, as later cases have observed, this statement by itself is remarkably overbroad.  "[A] state may suffer an abstract form of harm whenever one of its acts is enjoined.  To the extent that is true, however, it is not dispositive of the balance of harms analysis.  If it were, then the rule requiring 'balance' of 'competing claims of injury[]' would be eviscerated.  Federal courts instead have the power to enjoin state actions, in part, because those actions sometimes offend federal law provisions, which, like state statutes, are themselves 'enactments of its people or their representatives.'" *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009) (internal citations and alterations, and emphasis omitted), *vacated and remanded on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204 (2012).

argues, without presenting evidence or proof, that the district court's injunction of the provisions will irreparably injure the state's efforts to prevent election fraud. Most importantly in the stay context, the state did not provide any evidence at all that it has experienced any specific type of fraudulent activity; it merely asserts that the enjoined laws protect against the threat of fraud.

Tellingly, the majority does not advert to, rely on, or treat as meritorious the Secretary's arguments that the state is likely to be irreparably injured because the injunction will hamper its efforts to deter and detect fraud. Thus, it is undisputed that the argument lacks persuasion. While a state may enact a law based on a hunch that it will curb fraudulent conduct, a showing that the nonenforcement of such a provision will produce irreparable injury must be based on evidentiary proof. The Supreme Court has admonished that "simply showing some 'possibility of irreparable injury[]' fails to satisfy th[is] factor." *Nken*, 556 U.S. at 434-35 (internal citation omitted). The Secretary has not attempted to point to any evidence that the state will suffer irreparable injury because fraud is actually occurring, or that it is likely to occur because of the injunction of the five Election Code provisions. Without any substantiating evidence, the possibility of fraud is just that—a possibility.

The majority's mistake in finding that the Secretary carried her burden on this factor is evidently due to its inexplicable error in placing the burden of proof or persuasion on the plaintiffs rather than on the stay applicant, the Secretary. *See* Maj. Op., *ante* at 5 ("[W]e have here the somewhat circular situation of deciding whether there is irreparable harm to Andrade in part by analyzing the likelihood of success on the merits by Appellees of showing irreparable harm to them.") The majority's "circular" notion that the plaintiffs must show their likelihood of success and irreparable injury or else the Secretary is deemed to be irreparably harmed is dead wrong. The plaintiffs are not

required to carry any burden in connection with the question of whether this court should stay the district court's judgment.  As the Supreme Court has repeatedly held, the stay applicant, here the Secretary, bears the burden of proving all four of the factors required for a stay—irreparable injury to herself, the stay's lack of substantial injury to the plaintiffs, the Secretary's strong likelihood of success on the merits, and the stay's lack of injury to the public. There is no justification in law or warrant in the record for the majority to cast the burden on the plaintiffs and collapse its analysis into a unitary inquiry of whether the plaintiffs have shown likelihood of success on the merits.

### III.    Substantial Injury to Appellees

The absence of irreparable injury to the State is made all the more dramatic in contrast to the substantial injury that will result to the plaintiffs. The stay applicant bears the burden of showing both factors: that its own irreparable injury is likely if a stay is not issued,  and that the plaintiffs will not be substantially injured if the stay is granted.  *See, e.g.*, *Nken*, 556 U.S. at 433-34.  The majority elides most of its analysis as to whether the stay of the district court's judgment will substantially injure the plaintiffs.  The majority also implicitly places the burden of proving the "substantial injury" prong on the plaintiffs rather than the defendants. *See, e.g.*, Maj. Op., *ante* at 7 n.9, 14 n.16. In my view, it is clear that the plaintiffs' constitutional rights of expression and association are likely to be substantially endangered and damaged during the upcoming federal campaign and elections if the district court's judgment is stayed.

The Supreme Court has held that deprivation of First Amendment rights constitutes injury sufficient to establish irreparable injury.  *Elrod v. Burns*, 427

No. 12-40914

U.S. 347 (1976) (plurality opinion). In *Elrod*, the Court affirmed a preliminary injunction entered against state officers that barred enforcement of a "patronage" policy under which civil service employees were required to pledge loyalty to a particular political party. *Id.* at 350-51. The Court held that the policy infringed on the employees' First Amendment rights. *Id.* at 373. It explained, "[i]nasmuch as this case involves First Amendment rights of association which must be carefully guarded against infringement by public office holders, we judge that injunctive relief is clearly appropriate in these cases." *Id.* (quotation marks omitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* It added that "[t]he timeliness of political speech is particularly important. The purpose of the First Amendment includes the need to protect parties in the free publication of matters of public concern, to secure their right to a free discussion of public events and public measures, and to enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the authority which the people have conferred upon them[.]" *Id.* at 374 n.29 (internal quotation marks, alterations, and citations omitted). Therefore, the Court held that the plaintiffs were likely to suffer irreparable injury and were entitled to a preliminary injunction.

Applying *Elrod*, I conclude that the plaintiffs have demonstrated that if the district court judgment is stayed they are likely to suffer substantial injury to their significant First Amendment rights of political speech and association. In other words, as the district court found, the plaintiffs' voter-registration efforts and voting campaigns will be hamstrung by a stay of the district court's judgment.

31

No. 12-40914

The plaintiffs are organizations "dedicated to helping citizens become registered to vote and to encouraging eligible voters to vote." *Voting for Am. v. Andrade*, No. G–12–44, – F. Supp. 2d –, 2012 WL 3155566, at *2 (S.D. Tex. Aug. 2, 2012). Among other avenues, they rely on voter registration drives to convey their pro-voting message and to achieve their goals of greater registration. Their mode of operation is to partner with local nonprofit and civil groups to which they provide funding; they hire temporary employees to serve as canvassers. *Id.* at *2-3. Canvassers are often locally hired, but their trainers and managers, as well as some canvassers, are specially trained to conduct voter-registration drives and may come from out of state in order to engage in voter-registration efforts. The canvassers go to high-traffic locations to encourage people to register to vote and to assist them in doing so.

Crucially, the canvassers collect the applications for delivery and return them to their supervisors, who in turn perform "quality analysis and control checks by reviewing the applications for completeness and signs on fraud." *Id.* at *2. They then photocopy or scan all documents with confidential information redacted for tracking purposes and then mail them to the appropriate state office. *Id.* at *2-3. This provision is important because applicants who are added to the rolls are later contacted and encouraged to actually vote. For applicants who were not added to voter rolls, the plaintiffs seek to determine if the voter was rejected for a legitimate reason and if not, the plaintiffs inform them and contact them to re-register if they are eligible. The plaintiffs also use the information to keep track of whether voters are being denied the right to vote for improper reasons, and if so, they may seek legal or political action in response. *Id.* at *3. The plaintiffs also make hiring and termination decisions, based in part on the performance of their employees and volunteers in successfully registering voters. *Id.* at *3, *28.

No. 12-40914

The five enjoined provisions all serve to hamstring the plaintiffs' voter-registration efforts. The in-state restriction targets the plaintiffs because many of their organizers are trained nationally and come from out of state to engage in voter registration activity. As the district court found, the organizations' efforts are materially hampered if they cannot bring people from out of state to train their canvassers and oversee the process by which the applications are collected, checked for accuracy and completeness, and returned to the appropriate state agency. Likewise, the county limitation imposes significant administrative burdens on the plaintiffs. Employees must be trained and appointed in multiple counties. In addition, canvassers usually work in high-foot traffic areas, often in metropolitan regions, where many potential voters will be from different counties. Thus, canvassers must contend with potential voters residing in different counties traveling through population centers. Especially in light of the fact that Texas has 254 counties, this burden is quite severe.

The photocopying restriction is highly detrimental to the plaintiffs' business model and mode of operations because the plaintiffs photocopy or scan all documents (with confidential information redacted) so they can track the applications after mailing. *See id.* at *2-3. This permits the plaintiffs to follow up with applicants and encourage them to vote, to determine if a voter was rejected for a legitimate reason and, if not, to address the problem, and to determine whether legal or other action would be advisable. It also allows the organizations to screen applications for potential fraud. If the plaintiffs do not have copies of these records, they cannot efficiently perform these functions and this crucial part of their organizational efforts would be very difficult if not impossible.

The in-person provision requires that the plaintiffs return the completed applications in person within five days or else face criminal penalties. This

would impose a significant administrative burden in terms of work hours and costs because it would require the canvassers' time and effort to hand the applications in personally rather than simply sending them by mail. Because the individual who collects an application must personally deliver it within a short time period, the provision would also hamper the plaintiffs' ability to monitor the canvassers' work by performing quality analysis and control checks by reviewing the applications for completeness and signs of fraud, which could potentially take more than five days given the volume of applications. *See id.* at *2-3. The possibility of criminal sanctions would likely make this provision all the more burdensome.

The compensation provisions will either force the plaintiffs to rely on volunteer staff only, which would likely decimate their available staff, or else will prohibit the plaintiffs from disciplining paid canvassers for poor performance or low productivity. The compensation provision criminalizes the plaintiffs' "practice of requiring some bare minimum level of productivity," which is an additional injury with which the plaintiffs would be threatened. *Id.* at *29. Conversely, the inability to discharge "deadweight" employees might in turn make it more difficult to function effectively and secure donors. *Id.* at *31.

As Michael Slater, Executive Director of Project Vote and Voting for America, stated in his affidavit, the organizations are actually and materially hampered from engaging in their chosen form of advocacy in Texas. While "Project Vote would like to directly fund voter registration activity in Texas," it is unable to do so "because of restrictions placed on organizations conducting voter registration drives, and the risk of criminal liability for the organizations . . . [and] employees[.]" Slater Decl. ¶ 8, at 3.

The district court found that "[s]o long as the provisions remain in force, the likely violations of Organizational Plaintiffs' statutory and constitutional

No. 12-40914

rights continue, and they remain unable to engage in their chosen form of political speech and associational activity." *Id.* at *33. The plaintiffs are unable to operate and get out their message. Especially in light of the impending elections, the timeline of the appeal will likely last beyond the deadline to get people registered for the November elections, even with an expedited appeal schedule. Thus, the plaintiffs will not be able to get out their message in time for the elections, which is a significant and irreparable harm. Consequently, the district court clearly did not abuse its discretion in finding that the Secretary failed to carry her burden to show that a stay likely would not substantially injure the plaintiffs.

## IV.    Likelihood of Success on the Merits

In addition to the two "injury" factors, the Secretary must make a "strong showing" that she is likely to succeed on the merits. *See, e.g.*, *Nken*, 556 U.S. at 434. "[M]ore than a mere possibility of relief is required." *Id.* (internal citations and quotation marks omitted). In my view, the Secretary has not made a strong showing of a likelihood of success against either the First Amendment or the preemption claims.

### A.    First Amendment

The majority commits two grave errors in assessing the likelihood of success of the Secretary's argument that none of the enjoined state-law provisions violates the First Amendment. First, the majority takes an unprecedentedly narrow view of what conduct implicates the First Amendment. Second, the majority attempts to make the Secretary's showing of potential

35

No. 12-40914

success on the merits appear stronger by claiming that the plaintiffs' burden on the merits is heavier because they are making facial challenges to the state-law provisions, an approach the Supreme Court has never required and in fact disavowed in *Citizens United v. FEC*, 130 S. Ct. 876 (2010).

### 1.    *Voter-registration activities implicate the First Amendment*

The plaintiffs are engaged in the First Amendment activities of encouraging and assisting voters in registering to vote and in voting on election day.  In their methodology, the plaintiffs complete several steps that are woven into one process.  First, they furnish registration applications and persuade individuals to fill them out and consent to their being filed with the proper registrars.  Second, they copy the completed applications and see that the originals are properly filed with the correct registrars.  Third, they check with the registrars to make sure that the registration applications have been properly recorded.  Finally, they recontact the newly registered voters and provide them with assistance and encouragement in traveling to the proper voting places to vote on election day and render assistance if it appears they have been wrongfully denied the right to register to vote.  *See Voting for Am.*, 2012 WL 3155566, at *2-3.

The Secretary has not met her burden of proving a likelihood of success on the merits of her First Amendment argument. As the majority opinion observes, the Secretary concedes that the speech and expressive conduct in which the plaintiff organizations engage are within the protection of the First Amendment. *See* Maj. Op., *ante* at 10.  The majority opinion's First Amendment analysis relies on a compartmentalization of the plaintiffs' activities, reasoning  (1) that the voting regulations target only the physical collection and submission of

36

completed voter applications, and (2) that those particular activities are not part of expressive political conduct.  However, the collection and submission of completed voter application materials are inextricably intertwined with plaintiffs' political speech and expressive conduct in persuading and assisting voters to register, in making certain their registration applications are delivered and recorded by the proper registrars, and in encouraging and assisting the voters to actually vote on election day.  Thus, all of the plaintiffs' speech and activities involved in this entire process constitute core political speech and are protected by the First Amendment.

The majority's interpretation and approach is inconsistent with the Supreme Court's First Amendment jurisprudence.  Federal courts have rejected invitations like defendants' to compartmentalize core political activities from the "procedural" or "ministerial" aspects of those activities; the majority cannot point to a single federal decision that has approved the separation of expressive conduct from core political speech as it does today.  The Supreme Court rejected this divide-and-conquer strategy in cases in which the Court considered whether a similar core political activity, initiative petition circulation, was protected by the First Amendment.  *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999); *Meyer v. Grant*, 486 U.S. 414 (1988).  In fact, in both *Buckley* and *Meyer*, the state made the nearly identical argument that Texas does here—it argued that its regulations targeted only the ministerial tasks of collecting and submitting the signatures on a petition.  The Court was asked to compartmentalize those activities and conclude that the regulations only applied to the collection and submission of completed initiative applications—but the Court rejected the state's invitation to do so and found that all of the circulators' activities involved in initiative petition circulation were protected.

37

No. 12-40914

In *Buckley*, the Supreme Court held that the circulation of initiative petitions and attendant speech and activity is protected by the First Amendment. 525 U.S. at 192. The Court struck down a Colorado statute regulating the petition process, holding that three provisions violated the First Amendment's free speech guarantee: a provision requiring that initiative-petition circulators be registered voters; a provision requiring that initiative-petition circulators wear identification badges bearing the circulator's name; and a provision requiring that proponents of an initiative must report names and addresses of all paid circulators and amounts paid to each circulator. *Id.* at 186, 192.

In defending the regulations, the State of Colorado made a nearly identical argument in favor of its regulations on ballot-initiative circulation as the Secretary does in this case. Citing concerns about fraud in initiative circulation, Colorado argued that the conduct did not entail protected speech or expressive conduct: "The circulator *collects* the votes and *presents them to [the] Secretary of State to be validated and counted.* The signers depend upon the circulators to *collect and submit the signatures.*" Petition for Certiorari, *Buckley v. Am. Constitutional Law Found., Inc.* (No. 97–930), 1997 WL 33485681, at *11 (emphasis added). The state contended, "the circulator assumes a public role which can be regulated." *Id.* at *10. Thus, it argued that the conduct was not speech entitled to the highest protection of the First Amendment. *See id.*

The Court rejected this argument, concluding the conduct was important to voters to ensure that "the political process is responsive to their needs." *Buckley*, 525 U.S. at 196 (quotation marks omitted). The Court held that the underlying conduct was protected speech because it entailed "communication with voters about proposed political change[.]" *Id.* at 192. The communication at issue was "core political speech" for which First Amendment protection was

No. 12-40914

"at its zenith." *Id.* at 186-87 (internal quotation marks omitted) (quoting *Meyer*, 486 U.S. at 422, 425).  The Court found that the plaintiffs' speech was severely burdened by the law and, applying strict scrutiny, that the significant restriction on speech was not narrowly tailored to serve the asserted state interests of "administrative efficiency, fraud detection, [and] informing voters."  *Id.* at 192 & n.12.  Thus, all of the speech and connected conduct was protected.

Similarly, in *Meyer v. Grant*, the Supreme Court struck down Colorado's prohibition of payment for the circulation of ballot-initiative petitions.  486 U.S. at 416.  There, too, the state argued that circulators' conduct is not protected by the First Amendment.  Colorado argued in its brief:  "[T]he petition circulator [is] the person with the public duty to determine the validity of the signatures of the persons who sign the petitions. . . . The position is obviously governmental in nature.  *The verification of signatures does not constitute speech*, and the prohibition against payment of petition circulators constitutes nothing more than the prohibition against payment for the *act of verifying signatures*.  The fact that a person voluntarily links his conduct with a speech component does not transform the conduct into speech."  Petitioner's Opening Brief, *Meyer v. Grant* (No. 87-920), 1987 WL 880992 at *12 (emphasis added).

The Court rejected Colorado's argument, holding that the activity of collecting and verifying signatures is connected with the ballot circulators' overall message.  *See Meyer*, 486 U.S. at 421 ("The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change."). The Court explained, "[t]he First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id.* at 424.  Thus, the Court held that the restriction on paying the circulators "restrict[ed] political expression" by, inter alia, "limit[ing] the number of voices

No. 12-40914

who will convey appellees' message[.]" *Id.* at 422. The Court held that petition circulation is "core political speech" because it involves "interactive communication concerning political change." *Id.* at 424 (internal quotation marks omitted). First Amendment protection for such interaction is "at its zenith." *Id.* at 425 (internal quotation marks omitted). The Court held that Colorado's "refusal to permit appellees to pay petition circulators restricts political expression" because the "inevitable effect" of the state law was to "reduc[e] the total quantum of speech on a public issue." *Id.* at 422-23.

The *Meyer* Court concluded that, without question, the subject-matter of the initiative petition (whether the trucking industry should be deregulated in Colorado) was a matter of societal concern that the plaintiffs had a right to discuss publicly without risking criminal sanctions. "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment. The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. Appellees seek by petition to achieve political change in Colorado; their right freely to engage in discussions concerning the need for that change is guarded by the First Amendment." *Id.* at 421 (internal citations and quotation marks omitted).

Further, the Court in *Meyer* observed that "[t]he circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in

40

No. 12-40914

almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Id.* at 421-22 (footnote omitted).

The Court explained that this "core political speech" was inextricably mixed up in the more procedural aspects of ballot circulation, but that the speech, like the solicitation of charitable contributions, was nevertheless within the protection of the First Amendment. *Id.* at 422 n.5 (citing *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)). The Court stated: "Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that *solicitation is characteristically intertwined with informative and perhaps persuasive speech* seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Id.* (emphasis added) (internal quotation marks omitted).

Similarly, here, whether certain communities, such as Latino and African-American communities, are underrepresented in voting in Texas is a matter of societal concern that plaintiffs have a right to discuss publicly without risking criminal sanctions. More broadly, the decision of whether to vote and participate in the democratic process is a matter of public concern. Plaintiffs seek by voter registration drives and get-out-the-vote campaigns to achieve political change in Texas; their right freely to engage in discussion concerning the need for that change is guarded by the First Amendment. Project Vote organizers "approach members of the community, ensure that applications are completed legibly and completely, and discuss the importance of voting. [They] encourage canvassers to point out that if the community wants politicians to listen to their concerns

41

and do something about them, then the community as a whole needs to get registered to vote." Slater Decl. ¶16, at 5. Canvassers "distribute and collect voter registration applications while simultaneously discussing the importance of participating in the democratic process by voting." *Id.* ¶18, at 5. The ability to directly contact potential voters and assist them in filling out and submitting completed voter applications in person is a key way in which the organizations fulfill their mission of maximizing voter registration and "it also ensures that [potential voters] hear [their] message about how important it is to vote." *Id.* ¶24, at 8.

Like the circulation of initiative petitions, the canvassing of citizens to register to vote and to vote in elections "of necessity involves both the expression of a desire for political change" (including, e.g., the more adequate representation of historically disenfranchised voters in elections) and "a discussion of the merits of the proposed change" (e.g., the election of officials more empathetic to the needs of those voters). *Meyer*, 486 U.S. at 421. This will involve an explanation of why it is important that a person as a member of a class of voters become registered to vote and actually vote on election day. Thus, providing registration applications to these classes of voters, assisting them in actually recording their registrations, and assisting them and encouraging them to vote on election day is core political speech.

Moreover, just as the Court recognized in *Meyer* that the solicitation of signatures often involves speech protected by the First Amendment, so should we recognize here that the state's attempt to regulate the canvassing of persons to register to vote and to actually vote on election day would infringe on that speech. The plaintiffs encourage and assist voters, especially those in historically disenfranchised groups, in registering to vote and in voting on election day. Their process involves several steps, all of which are "intertwined."

No. 12-40914

First, they furnish registration applications and persuade individuals to fill them out and consent to their being filed with the proper registrars. Second, they copy the completed applications and see that the originals are properly filed with the correct registrars. Third, they check with the registrars to make sure that the registration applications have been properly recorded. Finally, they recontact the newly registered voters and provide them with assistance and encouragement in traveling to the proper voting places to vote on election day and render assistance if it appears they have been wrongfully denied the right to register to vote. *See Voting for Am.*, 2012 WL 3155566, at *2-3. The plaintiffs' registration and canvassing activities are "characteristically intertwined with informative and perhaps persuasive speech." *Meyer*, 486 U.S. at 422 n.5 (quotation marks omitted).

In both *Buckley* and *Meyer*, the Court refused to conclude that the ministerial act of collecting and submitting signatures for a ballot was the only conduct truly targeted by the regulations. The Court instead concluded that those activities were inherently wrapped up with the speech and expressive conduct that those signature drives entailed. Other courts have likewise rejected the Secretary's argument in favor of compartmentalizing registration procedures from protected speech and conduct. *See, e.g.*, *Bernbeck v. Moore*, 126 F.3d 1114, 1115 (8th Cir. 1997) ("We reject the Secretary of State's attempt to distinguish *Meyer* with the argument that the registered-voter requirement does not regulate 'political speech,' but rather the 'process' of conducting an initiative election, thereby raising no First Amendment concerns.").[2]  Here, Texas is

_____

[2] In addition, at least one federal district court has rejected a similar argument in the context of a voter-registration regulation much like the one at issue here. In *League of Women Voters of Florida v. Cobb*, 447 F. Supp. 2d 1314, 1320-21 (S.D. Fla. 2006), the court found the collection and submission of completed voter applications to be highly important to the organization and relevant to the court's First Amendment analysis: "The ability to collect voter

43

making the same argument—that the collection and submission of completed and signed voter registration applications to the county registrars is not protected conduct because it is a public function that should be divorced from the expressive elements of plaintiffs' activities. The same stratagem should be rejected here. Providing, collecting and delivering voter registration applications are all inherently bound up in the core political process of registration drives and get-out-the-vote campaigns.

The majority finds *Meyer* distinguishable because it addressed the constitutionality of a ballot initiative circulation law, not a voter-registration law. *See* Maj. Op., *ante* at 11 & n.11. Other than citing its "perception" that voter registration is different, Maj. Op., *ante* at 11, the majority does not justify distinguishing between these types of activities and core political speech although all other courts have rejected defendants' invitation to do so.

In light of the literally unprecedented nature of the majority's approach, I cannot see how the defendants have established a "strong showing" of likelihood of success on the merits, which the Supreme Court has emphasized means "more than a mere possibility of relief[.]" *Nken*, 556 U.S. at 434 (internal alterations and quotation marks omitted). Faced with a First Amendment argument with such a losing track record, it defies logic how the majority can find the argument to amount to anything more than "a mere possibility" that the defendants will prevail.

---

registration applications enables [the plaintiffs] to have follow-up communications with registrants about issues of common concern. . . . [O]nce [the organization] updates its database, it sends newly registered voters education materials, including materials about candidates and issues. Furthermore, [the plaintiffs'] application efforts facilitate[] their follow-up with the supervisors of elections to resolve any problems with incomplete applications or missing information and to ensure that their members are properly added to the voter rolls." *Id.* at 1320-21. The court held that the speech and conduct was squarely within the protection of the First Amendment. *Id.* at 1332-33.

No. 12-40914

## 2.  *The "facial challenge" concept does not create a "high hurdle" or change the burdens and standards governing the issuance of a stay pending appeal*

Contrary to the majority's reasoning, the plaintiffs' challenges may be more correctly described as a mixture of facial and as-applied challenges to the Secretary's enforcement of state laws that thwart and burden the plaintiffs' exercise of First Amendment political speech and associational rights in voter registration drives and get-out-the-vote campaigns.  The majority's conclusion that the plaintiffs cannot be making both a facial challenge and an as-applied challenge rests on a faulty premise.  The concept of a facial challenge is not well settled and there is not one single test for all facial challenges; on the contrary, the Supreme Court's decision in *Citizens United v. FEC*, 130 S. Ct. 876 (2010) has contradicted this erroneous idea.  Rather, courts apply whatever constitutional doctrine is relevant to the claim in a particular case.  *Id.* at 919 (Roberts, C.J., concurring) ("[T]he debate over whether to consider this claim on an as-applied or facial basis strikes me as largely beside the point. . . . Citizens United has a constitutional claim . . . [and] [t]he Government has a defense. . . . Whether the claim or the defense prevails is the question before us.")).  "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge."  *Id.* at 893 (majority opinion) (citing, inter alia, Richard H. Fallon, Jr., *As–Applied Challenges and Third–Party Standing*, 113 Harv. L. Rev. 1321, 1339 (2000) ("[O]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases.")).  The real significance of the facial/as-applied distinction, the Supreme Court has explained, is that "it goes to the breadth of the remedy employed by the Court[.]"

45

No. 12-40914

*Id.* In other words, the facial invalidation of a statute is a broader remedy than an as-applied invalidation. The remedy in a successful facial challenge is an order barring enforcement of the law in all circumstances, whereas in an as-applied challenge, the remedy is an order barring enforcement in some particular set of circumstances. *See id.*

Likewise, the "no set of circumstances test" that the majority appears to employ to the plaintiffs' facial challenge lacks foundation. *See, e.g.*, *Doe v. City of Albuquerque*, 667 F.3d 1111, 1126 (10th Cir. 2012) (quoting with approval the opinion "that the 'no set of circumstances' language from [*United States v. Salerno*, 481 U.S. 739, 745 (1987)] constituted 'nothing more than a controversial dictum' and . . . that 'diligent research' had failed to turn up 'a single Supreme Court case—including *Salerno* itself—in which the holding actually relied on the 'no set of circumstances' test'") (quoting *Sonnier v. Crain*, 613 F.3d 436, 463-64 (Dennis, J., concurring in part and dissenting in part); *see also* Scott A. Keller & Misha Tseytlin, *Applying Constitutional Decision Rules Versus Invalidating Statutes in Toto*, 98 Va. L. Rev. 301, 312-14 & nn. 45-59 (2012) (collecting cases).

All this is to say, without exhaustively reiterating the facial versus as-applied debate, that the majority cannot invoke as a talisman the "facial challenge" concept to impose a higher burden that the First Amendment requires for proof of the plaintiffs' constitutional claims. The majority cannot, by this sleight of hand, shift the burden of persuasion off of the state and back onto the Plaintiffs, contrary to the burden and standards governing the issuance of stays prescribed by the Supreme Court's holdings in *Nken* and others. *See, e.g.*, *Nken*, 556 U.S. at 433-34. The majority's approach lacks foundation in law and is contrary to the standards governing stays pending appeal that place the burden on the party requesting the stay to establish a likelihood of success.

No. 12-40914

### 3.   *The Secretary did not make a strong showing that she is likely to succeed in defending the burdens imposed on First Amendment rights by the state voter registration provisions enjoined by the district court.*

Applying the correct First Amendment principles, the district court justifiably concluded  that the Secretary failed to carry her burden to make a strong showing that she is likely to succeed on the merits in her appeal.  For the reasons stated by the district court, and for additional reasons assigned herein, I agree  that the Secretary's motion to stay the district court's judgment should be denied.

The burdens imposed on the plaintiffs' core political conduct and speech make it impossible for them to conduct voter registration drives and get-out-the-vote campaigns using their chosen effective methods of operations they have employed in other states.  The state argues that the restrictions imposed by its laws are necessary to prevent fraud in connection with elections in Texas.  The only specific kind of fraud it identifies, however, are cases in which a voter registration worker intentionally deprives a person of the opportunity to vote by failing to deliver timely a completed registration application to the appropriate registrar, or in which a person fraudulently uses a false identity to register and to vote in an election.  The district court reasonably concluded that the election regulations at issue burdened the plaintiff organizations' core political conduct and speech without narrowly tailoring its restrictions to further its goal of preventing or punishing these specific kinds of criminal conduct.

With regard to the in-state restriction (Tex. Elec. Code §§ 13.031 (d)(3) & 11.002 (a)(5)), the district court found it was likely to violate the First Amendment because it "imposes a substantial burden on [plaintiffs'] First Amendment rights, and Defendants have not been able to explain how it substantially advances a legitimate state interest."  *Voting for Am.*, 2012 WL

47

No. 12-40914

3155566, at *25. It imposes a substantial burden on the plaintiffs' rights because they are prevented from making use of their nationally trained staff and from engaging in their chosen mode of operation they deem the most effective. On the other hand, the state did not explain how the law advances the state's goal because the state did not produce any evidence that non-residents of Texas were any more apt to commit these wrongs than Texas residents. *Id.* at *24-25. Indeed, the state introduced no evidence that these misdeeds had been committed in Texas by either residents or non-residents. *Id.* at *25, *34.

As to the county limitation (Tex. Elec. Code § 13.038), the court found it was likely to violate the First Amendment because it imposes a heavy administrative burden on an organization conducting voter registration drives as its employees must be recruited, appointed, and trained in each county (and Texas has 254 counties), which would not be feasible or efficient in urban centers covering multiple counties. *Id.* at *25-26 & n.21. Conversely, there are little or no "county-specific issues" that arise vis-à-vis voter registration, as it is a state or federal matter, and county-level registration would have a negligible impact on voter fraud. *Voting for Am.*, 2012 WL 3155566, at *26-27. Thus, the law imposes a heavy administrative burden but is not narrowly tailored to achieving the state's goal of fraud prevention.

Finally, the court held that two of the three sub-provisions of the compensation prohibition (Tex. Elec. Code §§ 13.008 (a)(1) & (3)) violated the First Amendment.[3] The court reasoned that subsections (1) and (3) severely burden the plaintiffs' First Amendment activities because they prohibit the plaintiffs from disciplining canvassers for poor performance or low productivity and criminalizes the plaintiffs' "practice of requiring some bare minimum level

---

[3] The plaintiffs did not challenge subsection (2), prohibiting the payment of canvassers per application collected, because they do not employ that practice.

of productivity," and the statute could not and did not draw the line between bare minima and theoretical "excessively high quotas." *Voting for Am.*, 2012 WL 3155566 at *29. In addition, it would make it nearly impossible to discharge "deadweight" employees, which might accumulate in the organization as time progresses, which in turn would make it more difficult to function effectively, secure donors, etc. *Id.* at *30-31.[4] The court postponed the decision of whether strict scrutiny would apply to this provision, and held that it did not even pass muster under the less restrictive *Anderson-Burdick* balancing test. *Id.* at *32. Though the state advanced a legitimate state interest (preventing voter fraud), the law is not narrowly tailored as it would criminalize common necessary employment practices. *Id.*

The majority concludes that the state's interests in deterring and preventing fraud are sufficient to sustain the election regulations. However, the Secretary has not introduced evidence of fraud; the majority takes it at face value that an unsubstantiated risk of fraud is enough to justify a significant infringement on the plaintiffs' First Amendment rights. As Justice Thomas noted in his concurring opinion in *Buckley*, however, "the State has failed to

---

[4] The majority's opinion does not engage with the district court's finding on this point, but rather calls the threat "hypothetical," citing the fact that the plaintiffs are making a facial challenge. Maj. Op., *ante* at 16. But this does not change the fact that the text of the compensation provision prohibits common and necessary employment practices. the Secretary challenged the district court's finding as to this point, arguing that the district court erred in interpreting section 13.008, the compensation provision, as forbidding organizations to fire employees for "lack of diligence." She argues that the court should have interpreted the provision to imply that only compensation for "excessively high quotas" would be criminalized under the statute. Contrary to the majority's suggestion, it is the Secretary's, not the plaintiffs', interpretation that is "hypothetical" because the Secretary cannot point to a firm reason why this limitation must be read into the statute. The "excessively high quota" limitation does not appear in the plain text of the statute, and the Secretary does not proffer any principle of statutory interpretation that would permit the court to conclude that the statute only applies to "excessively high quotas." *Cf.* Tex. Elec. Code § 13.008. Thus, the Secretary has not made a strong showing that she is likely to prevail on this argument.

No. 12-40914

satisfy its burden demonstrating that fraud is a real, rather than a conjectural, problem." 525 U.S. at 210 (Thomas, J., concurring).

The majority's reasoning is doubly unpersuasive because, with regard to the regulations the district court found likely unconstitutional, the court not only noted that the Secretary failed to demonstrate any evidence of actual fraud, but also that the Secretary failed to demonstrate how the provisions would reasonably achieve the goal of fraud prevention. Thus, although a state need not have evidence of fraud to justify enactment of a particular election regulation, without objective evidence or expert opinion, the Secretary failed to make a strong showing that the measure actually prevented or reduced fraudulent acts and was narrowly tailored to do so.

Moreover, other laws preexisting the third-party registration law were in place to prevent fraud, *see, e.g.*, Tex. Elec. Code § 13.007 (stating that a person commits an offense if he or she "knowingly makes a false statement or requests, commands, or attempts to induce another person to make a false statement on a registration application"); as the district court reasoned, enjoining the provisions in question were not demonstrated to materially lessen the deterrent effect of the whole scheme of applicable Texas laws.

For these reasons, the Secretary did not meet her burden of making a strong showing that she is likely to prevail on the merits. The district court did not abuse its discretion in denying the Secretary's motion for a stay pending appeal as to the provisions enjoined pursuant to the First Amendment.

## B.    Preemption

The Secretary also has not met her burden of making a strong showing of her likelihood to succeed on the merits in proving that two of the Texas election

50

provisions, the photocopying ban and the in-person delivery of applications requirement, have not been preempted by the National Voter Registration Act (NVRA).

### 1.     *Preemption under the Elections Clause*

The right to vote has long been recognized as central to the protection and exercise of the other rights guaranteed in our society.  As noted by the Supreme Court in *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964), "[o]ther rights, even the most basic, are illusory if the right to vote is undermined."  Nevertheless, many practical barriers remain that inhibit the free exercise of this recognized right. Among such barriers are restrictive or prohibitively inconvenient voter registration requirements that discourage or even prevent qualified voters from registering and participating in elections.  "In an attempt to reinforce the right of qualified citizens to vote by reducing the restrictive nature of voter registration requirements, Congress passed the National Voter Registration Act in 1993."  *Ass'n of Comm'y Orgs. for Reform Now v. Miller*, 129 F.3d 833, 835 (6th Cir. 1997) (citing 42 U.S.C. §§ 1973gg(a),(b)).

The NVRA reflects the view of Congress that the right to vote "is a fundamental right," that government has a duty to "promote the exercise of that right," and that discriminatory and unfair registration laws can have a "damaging effect on voter participation" and "disproportionately harm voter participation by various groups, including racial minorities." 42 U.S.C. § 1973gg(a). Congress enacted the NVRA in order to "increase the number of eligible citizens who register to vote" in federal elections, "enhance[] the participation of eligible citizens as voters[,]" "protect the integrity of the electoral process[,]" and "ensure that accurate and current voter registration rolls are

No. 12-40914

maintained." *Id.* § 1973gg(b); *Project Vote / Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012).

The NVRA directs states to establish at least three methods of voter registration for federal elections: "(1) by application made simultaneously with an application for a motor vehicle driver's license[,]" "(2) by mail application" using a federally prescribed form, and "(3) by application in person" at designated voter registration agencies. 42 U.S.C. § 1973gg–2(a). It further requires that states conduct a general program to remove ineligible voters from official voter lists without engaging in improper voter removal. *Id.* § 1973gg–6(a)(3)-(4); *Long*, 682 F.3d at 334.

Section 8(i)(1) of the NVRA mandates public disclosure of voter registration activities. *Id.* § 1973gg–6(i)(1). It generally requires states to "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" *Id.* "This language embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Long*, 682 F.3d at 334-35.

Of the eight regulations at issue in the present case, the district court entered an order preliminarily enjoining the enforcement of Texas' photocopying prohibition (Tex. Elec. Code § 13.038, as interpreted by the Secretary) and personal delivery requirement (*id.* § 13.042), finding them to be preempted by the NVRA. When preemption challenges are brought against state election laws, the Elections Clause of the Constitution governs. *See Foster v. Love*, 522 U.S. 67, 69 (1997).

No. 12-40914

"The Elections Clause establishes a unique relationship between the state and federal governments." *Gonzales v. Arizona*, 677 F.3d 383, 390 (9th Cir. 2012) (en banc). The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators." U.S. Const. art. I, § 4, cl. 1 (spelling modernized). Thus, while states have the initial responsibility of establishing election laws and regulations, Congress has the authority to "make or alter" the states' regulations. The text of the constitutional provision expressly delegates to Congress ultimate supervisory authority over elections laws.

When states enact election laws that are contrary to federal election laws, the state laws are unquestionably preempted. *See Ex Parte Siebold*, 100 U.S. 371, 384 (1879) (when Congress' power under the Elections Clause is "exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them"); *Foster*, 522 U.S. at 69 (stating that the Elections Clause "invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices") (internal citation omitted). However, unlike preemption for ordinary laws under the Supremacy Clause, there is no presumption against preemption for state election laws that are contrary to federal election mandates. As the court in *Gonzales* explained, "[i]n contrast to the Supremacy Clause, which addresses preemption in areas within the states' historic police powers, the Elections Clause affects only an area in which the states have no inherent or reserved power: the regulation of federal elections." 677 F.3d at 392. "[T]he Supreme Court has never articulated any doctrine giving deference to the states under the Elections Clause." *Id.* at 400 (Kozinski, C.J., concurring).

No. 12-40914

Under our Circuit precedent, if a state election law "directly conflicts" or is "inconsistent with" a federal election law, the state law is preempted under the Elections Clause. *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775, 776 (5th Cir. 2000). Applying this rule, the district court held that the two regulations at issue "directly conflicted" with the NVRA and were therefore preempted under the Elections Clause.

The district court did not find it necessary to go any further than its "direct conflict" analysis. However, this court's language in *Bomer* finding preemption where a state election law "directly conflicts" or is "inconsistent with" a federal election law has deeper roots in Supreme Court precedent indicating that preemption under the Election Clause entails a more searching analysis than preemption under the Supremacy Clause. *See id.* (citing *Foster*, 522 U.S. at 68). *Bomer* reflects that there is no presumption against preemption when it comes to state laws that "conflict" or are "inconsistent with" federal election regulations enacted by Congress, consistent with the Supreme Court's opinion in *Foster v. Love*. *See* 522 U.S. at 69 (stating that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices") (internal citation omitted).

As the Ninth Circuit persuasively elucidated in *Gonzales v. Arizona*, "[w]hile Congress may not always choose to exercise [its Election Clause] power, 'when exercised, the action of Congress, so far as it extends and conflicts with the regulations of a State, necessarily supersedes them.'" 677 F.3d at 391 (alteration omitted) (quoting *Ex Parte Siebold*, 100 U.S. at 384, and citing *Foster*, 522 U.S. at 69). The Ninth Circuit in *Gonzales* concluded that under *Siebold* and *Foster*, courts should approach preemption under the Elections Clause by

54

No. 12-40914

reading state and federal election laws together as one single system of election law. It explained:

> Reading *Siebold* and *Foster* together, we derive the following approach for determining whether federal enactments under the Elections Clause displace a state's procedures for conducting federal elections. First, as suggested in *Siebold*, we consider the state and federal laws as if they comprise a single system of federal election procedures. *Siebold*, 100 U.S. at 384. If the state law complements the congressional procedural scheme, we treat it as if it were adopted by Congress as part of that scheme. *See id.* If Congress addressed the same subject as the state law, we consider whether the federal act has superseded the state act, based on a natural reading of the two laws and viewing the federal act as if it were a subsequent enactment by the same legislature. *Foster*, 522 U.S. at 74, 118 S.Ct. 464; *see id.* at 72–73, 118 S.Ct. 464. If the two statutes do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to "alter" the state's regulation, and that regulation is superseded.

*Gonzales*, 677 F.3d at 394.

Applying the principles of *Foster* and *Siebold*, as explained in *Gonzales* and *Bomer*, I conclude that the Secretary has not met her burden of showing a strong likelihood of success that the Texas photocopying ban and personal delivery requirement are not preempted by the NVRA either under the Fifth Circuit's "direct conflict" or "inconsistent with" test or under the Ninth Circuit's failure to "operate harmoniously" test.

### 2. *The photocopying provision*

As interpreted by the Secretary, section 13.038 flatly prohibits any person collecting voter registration applications from photocopying them before they are delivered to the registrars. The Secretary does not change her interpretation on

No. 12-40914

appeal. Relying on the Secretary's interpretation of how section 13.038 is to be enforced, the district court held that the photocopying provision (Tex. Elec. Code § 13.038) directly conflicts with the NVRA provision, 42 U.S.C. § 1973gg-6(i)(1). Subsection 6(i)(1) provides:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

In *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012), the court considered the State of Virginia's practice of prohibiting public disclosure of applications that had been accepted but rejected by registrars. Voting rights groups wanted to see the ones that had been rejected to ensure transparency in the voter registration process, and to investigate whether a group of students at a historically African-American university had been unlawfully disenfranchised. *Id.* at 333-34. The court held that all completed applications must be made available for copying under the NVRA. *Id.* at 336. The Fourth Circuit held that in this provision, because "the phrase 'all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters' unmistakably encompasses completed voter registration applications, such applications fall within Section [6](i)(1)'s general disclosure mandate." *Id.* The court reasoned that reviewing voter registration applications is a "program" and "activity" because it is carried out to maintain voter rolls for the state, and the registration applications are "records" that concern the "implementation of" that "program[] and activit[y]" because they are the means by which voters establish

their eligibility to vote. *Id.* at 335-36. The court noted that the state was entitled to redact sensitive information, such as social security numbers, when it complied with the NVRA provision, thus obviating the state's principal concern. *Id.* at 334, 339. The court concluded that Virginia's provision was preempted by the NVRA. *Id.* at 337.

In addition to its textual analysis, the court emphasized that the NVRA expresses a policy strongly favoring transparency and public disclosure of completed voter applications. *See id.* at 334. The NVRA photocopying provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Id.* at 334-35.

Following *Long*, the district court in the present case found that the NVRA's rule requiring states to "make available" the records for photocopying "unmistakably encompasses completed voter registration applications." *Voting for Am.*, 2012 WL 3155566, at \*16-17. The sound reasoning in *Long* is substantially applicable to this case. As Judge Wilkinson noted in *Long*, the NVRA is intended to guard against franchise sacrifice to state "administrative chicanery, oversights, or inefficiencies" in the conduct of federal elections. *See* 682 F.3d at 335. The NVRA embodies a strong policy in favor of transparency in election regulations, which extends to the disclosure of completed voter applications. Here, the Texas provision punishing a person for retaining a photocopy of a completed application before filing is just as detrimental, if not more so, to the NVRA's mandate of public disclosure of voter registration activities. Texas' photocopying ban prevents VDRs from providing their own check (by retained photocopies) against franchise sacrifice to "administrative chicanery, oversights, or inefficiencies" that the NVRA was enacted to guard

against. Texas' photocopying restriction applies to completed applications whether or not VDRs redact sensitive information; thus, it provides for punishment even if a VDR redacts voters' sensitive information from the copy. Therefore, the photocopying restriction is not narrowly designed to protect voters' privacy, which could be safeguarded by laws specifically punishing use or abuse of such sensitive information. Consequently, in my view the district court did not err or abuse its discretion in deciding that there is a substantial likelihood that the Texas photocopying ban has been preempted because it is inconsistent and disharmonious with the NRVA public disclosure provisions.

### 3.    *The in-person provision*

Next, the district court in the present case held that the personal delivery requirement directly conflicted with NVRA provisions 42 U.S.C. §§ 1973gg–4(a)(1)-(2) and 1973gg–6(a)(1). Subsection 4 provides that "[e]ach State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to section 1973-7(a)(2)[.]" *Id.* § 1973gg-4(1). Subsection 2 states that "notwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in Elections for Federal office . . . by mail application pursuant to section 1973gg–4[.]" *Id.* § 1973gg–2(a). Subsection 6 likewise requires each state to "ensure that any eligible applicant is registered to vote in an election . . . in the case of registration by mail under section 1973gg-4" if the form is postmarked in time. *Id.* § 1973gg–6(a)(1).

The district court interpreted these provisions to mean that the federal mail-in application "must be allowed in all circumstances." *Voting for Am.*, 2012

No. 12-40914

WL 3155566 at *18 (citing *Charles H. Wesley Educ. Found v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005).) In *Charles H. Wesley*, the Eleventh Circuit held that Georgia's voter-registration law prohibiting the mailing of "bundled" voter applications was preempted by the NVRA. It explained: "By requiring the states to accept mail-in forms, the Act . . . regulate[s] the method of delivery, and by so doing overrides state law inconsistent with its mandates. The Act simply requires that valid registration forms delivered by mail and postmarked in time [to] be processed." 408 F.3d at 1354.

In the present case, the district court found that federal law makes no distinction between VDRs and voters mailing in applications on their own behalf, and that Texas' in-person requirement is inconsistent with the federal law, which requires that states "accept and use" all federal mail-in applications. *Voting for Am.*, 2012 WL 3155566, at *18-19 (citing *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 702 n.6 (N.D. Ohio 2006) (finding a state law "requir[ing] personal delivery of voter registration forms . . . would clearly run afoul of the NVRA").) Therefore, the district court held the personal delivery requirement likely to be preempted.

Texas states that it will accept all mailed in applications, regardless of whether the sender violates state law in mailing them in rather than submitting them in person. However, even if this is the case, it remains that Texas prohibits third parties from submitting applications by mail under pain of criminal punishment, even though mail-in applications must be permitted under federal law. The public is entitled under federal law to take advantage of mail-in voter applications. The Texas law punishes third parties criminally for submitting voter applications by mail when there is a federal directive to the contrary. *See* Tex. Elec. Code § 13.043. The NVRA makes no distinction or exception for third parties, such as VDRs, mailing in applications. There is a

59

No. 12-40914

direct conflict and certainly a "disharmony" or "inconsistency," causing the law to be preempted by the NVRA. The Secretary bears a heavy burden of demonstrating that she is likely to succeed on the merits of her challenge, and she has not met her burden here.

## V.     Public Interest

Finally, a stay of the district court's judgment will not serve the public interest. *See, e.g.*, *Hilton*, 481 U.S. at 777. A stay pending appeal is contrary to the public interest because, as the Supreme Court has stated, "voting is of the most fundamental significance under our constitutional structure." *Burdick v. Tadashi*, 504 U.S. 428, 433 (1992) (quotation marks omitted). The laws here "reduc[e] the total quantum of speech on [the] public issue[s]" of voter registration and minority enfranchisement, *see Meyer*, 486 U.S. at 423, and are likely to diminish the total number of eligible voters who are registered in Texas, especially among historically underrepresented communities.

Texas' voter registration laws unquestionably made it more difficult to register to vote, thereby decreasing the level of enfranchisement in the state. The plaintiffs' voter-registration drives "are primarily aimed at registering voters from demographic groups . . . with a history of underrepresentation in the political process." *Voting for Am.*, 2012 WL 3155566, at *2. As the district court found, it is in the public interest to protect constitutional rights and effectuate the enforcement of the federal statute, and, most importantly, to ensure that all voters have access to the polls on election day. *See id.* at *35. As discussed above, it is not clear how the enjoined provisions will actually help fight voter fraud; and on the other hand, the provisions are alleged to contribute to disenfranchisement of vulnerable and historically disenfranchised voters, such

60

as the young, the elderly, the disabled, and racial minority communities in Texas.

The state's asserted interest in preventing voter fraud cannot justify the severe impingement on plaintiffs' voter-registration rights and the concomitant intrusion into the ability of many historically disenfranchised voters to register to vote. In this election cycle, two Voting Rights Act panels have refused to preclear portions of Texas' recently overhauled election law regime, finding that the redistricting and the voter ID provision are both likely to have the effect of reducing the number of minority voters eligible to vote in the state. *See Texas v. Holder*, No. 12-0128, – F. Supp. 2d –, 2012 WL 3743676 (D.D.C. Aug. 30, 2012); *Texas v. United States*, No. 11-1303, – F. Supp. 2d –, 2012 WL 3671924 (D.D.C. Aug. 28, 2012) (redistricting). As Judge Tatel persuasively demonstrated in his opinion for the three-judge panel, the voter ID law at issue was akin to other historical barriers to enfranchisement such as poll taxes, literacy tests, grandfather clauses, and property qualifications. Those barriers, "though race-neutral on their face," were calculated to reduce the number of racial minorities to vote. *Texas v. Holder*, 2012 WL 3743676, slip op. at *8. The majority's opinion today, I fear, lends legitimacy to a modern iteration of these historical ballot access measures—draconian voter-registration regulations.

The Secretary has failed to carry her burden to make a strong showing that there is a likelihood that she will prevail on the merits; that the state will be irreparably injured by the lack of a stay; that the plaintiffs will not be substantially injured by the stay; and that the public interest will not be harmed by the stay. The majority disregards the Supreme Court's declaration of the burden of proof and standards governing the issuance of a stay of a district court's judgment and it clearly errs in granting the stay. Accordingly, I dissent.